**STATE OF HAWAII, By its ATTORNEY GENERAL, on Behalf of the DEPARTMENT OF HAWAIIAN HOME LANDS and the Hawaiian Homes Commission, Plaintiffs,**

v.

**UNITED STATES of America, and Department of the Navy, Defendants.**

**Civ. No. 86–755HMF.**

United States District Court,
D. Hawaii.

Jan. 5, 1988.

Warren Price, Atty. Gen., George K.K. Kaeo, Jr., Kumu B. Vasconcellos, Deputy Attys. Gen., Dept. of Hawaiian Home Lands, William Tam, Deputy Atty. Gen., State of Hawaii, Paul, Johnson & Alston, Corey Y.S. Park, Honolulu, Hawaii, for plaintiffs.

Daniel Bent, U.S. Atty., Gary Beaver, Special Asst. U.S. Atty., Honolulu, Hawaii, Steven A. Herman, Bradley D. Jackson, U.S. Dept. of Justice, Land and Natural Resources Div., General Litigation Section, Washington, D.C., for defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

FONG, Chief Judge.

The State of Hawaii sues the United States of America and the Department of the Navy to quiet title to two parcels of land in Lualualei, Waianae District, Island of Oahu, used by the Department of the Navy for an ammunition depot and a radio transmitting facility (the "Lualualei lands"). Defendants move for summary judgment, asserting that because Hawaii's cause of action accrued more than twelve years before the filing of the complaint, on October 24, 1986, this action is barred until the lands are no longer used for national defense purposes.

The Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, is the exclusive means to challenge the United States' interest in land. *Block v. North Dakota*, 461 U.S. 273, 280, 103 S.Ct. 1811, 1816, 75 L.Ed.2d 840 (1983). The QTA's twelve year statute of limitations is not applicable to States. However, with respect to land used or required by the United States for national defense purposes, a State cannot maintain an action until the use or requirement of the lands for national defense purposes ceases, if the State knew or should have known of the United States' claims for more than twelve years.

## FACTUAL BACKGROUND

### A. Pre–Statehood

#### 1. United States' Title in Public Lands

In 1898, the Republic of Hawaii ceded to the United States the absolute fee and ownership of all public, Government, or Crown lands, including the Lualualei lands. This cession was accepted and confirmed by the U.S. Congress in a Joint Resolution dated July 7, 1898.[1]

In 1900, the United States created the Government of the Territory of Hawaii, by the Hawaiian Organic Act, which was amended in 1910. Section 73 of the Organic Act continued the laws of Hawaii relat-

1. 55th Cong., Sess. II, Res. No. 55, *reprinted at* 30 Stat. 750 (1898), providing in pertinent part,

Whereas the Government of the Republic of Hawaii having, in due form, signified its consent, in the manner provided by its constitution, to cede absolutely and without reserve to the United States of America all rights of sovereignty of whatsoever kind in and over the Hawaiian Islands and their dependencies, and also to cede and transfer to the United States the absolute fee and ownership of all public, Government, or Crown lands, public buildings or edifices, ports, harbors, military equipment, and all other public property of every kind and description belonging to the Government of the Hawaiian Islands, together with every right and appurtenance thereunto appertaining: Therefore,

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That said cession is accepted, ratified, and confirmed, and that the said Hawaiian Islands and their dependencies be, and they are hereby, annexed as a part of the territory of the United States and are subject to the sovereign dominion thereof, and that all and singular the property and rights hereinbefore mentioned are vested in the United States of America.

ing to public lands in force, and provided that the commissioner of public lands was to manage "all lands in the possession, use, and control of the Territory," except those set aside for public purposes.[2] Section 91 provided that the public property ceded to the United States at annexation was to remain in the "possession, use, and control" of the Territory until otherwise provided for by Congress or taken for the uses and purposes of the United States by the President or the governor of Hawaii.[3] Section 91 permitted the President to restore any public property taken for the uses and purposes of the United States to its previous status, and permitted the title of any public property in the possession and use

of the Territory to be transferred to the Territory or a political subdivision of the Territory for various listed public purposes by direction of the President.[4]

### 2. Status of Lands as Hawaiian Homes Lands

In 1921, Congress passed the Hawaiian Homes Commission Act ("HHCA").[5] Section 203 of the HHCA designated certain "public lands," including the Lualualei lands,[6] as "available lands" that automatically assumed the status of Hawaiian Homes lands under the control of the Hawaiian Homes Commission (the "HH Commission").[7] The HH Commission was au-

---

2. Organic Act of Hawaii, § 73, 56th Cong., Sess. I, Ch. 339 (1900), *reprinted at* 31 Stat. 141, 154–55, *as amended by* Public Law No. 192, 61st Cong., Sess. II, Ch. 258 (1910), *reprinted at* 36 Stat. 443, 447, providing in pertinent part,

COMMISSIONER OF PUBLIC LANDS.

SEC. 73. That the laws of Hawaii *relating to* public lands, the settlement of boundaries, and the issuance of patents on land-commission awards, except as changed by this Act, shall continue in force until Congress shall otherwise provide.

\*　\*　\*　\*　\*　\*

(q) All lands in the possession, use, and control of the Territory shall hereafter be managed by the commissioner, *except such as shall be set* aside for public purposes as hereinafter provided; all sales and other dispositions of such land shall be made by the commissioner or under his direction, for which purpose, if necessary, the land may be transferred to his department from any other department by direction of the governor, and all patents and deeds of such land shall issue from the office of the commissioner, who shall countersign the same and keep a record thereof.... All orders setting aside lands for forest or other public purposes, or withdrawing the same, shall be made by the governor, and lands while so set aside for such purposes may be managed as may be provided by the laws of the Territory.

3. Organic Act of Hawaii, § 91, 56th Cong., Sess. I, Ch. 339 (1900), *reprinted at* 31 Stat. 141, 159, providing in pertinent part,

SEC. 91. That the public property ceded and transferred to the United States by the Republic of Hawaii under the joint resolution of annexation, approved July seventh, eighteen hundred and ninety-eight, shall be and remain in the possession, use, and control of the government of the Territory of Hawaii, and shall be maintained, managed, and cared for by it, at its own expense, until otherwise provided for by Congress, or taken for the uses and purposes of the

United States by direction of the President or of the governor of Hawaii.

4. Public Law No. 192, 61st Cong., Sess. II, Ch. 258 (1910), *reprinted at* 36 Stat. 447, providing in pertinent part,

... And any such public property so taken for the uses and purposes of the United States may be restored to its previous status by direction of the President; and the title to any such public property in the possession and use of the Territory for the purposes of water, sewer, electric, and other public works, penal, charitable, scientific, and educational institutions, cemeteries, hospitals, parks, highways, wharves, landings, harbor improvements, public buildings, or other public purposes, or required for any such purposes, may be transferred to the Territory by direction of the President, and the title to any property so transferred to the Territory may thereafter be transferred to any city, county, or other political subdivision thereof by direction of the governor when thereunto authorized by the legislature.

5. Public Law No. 34, 67th Cong., Sess. I, Ch. 42 (1921), *reprinted at* 42 Stat. 108.

6. Hawaii contends that all of the Lualualei lands were designated as "available lands" under the HHCA. Section 203(a) of the HHCA only describes the land as, "(4) On the island of Oahu: ... Lualualei (two thousand acres, more or less), in the district of Waianae; ..." Defendants do not concede that any of the Lualualei lands were included in this description, but assume that they were for purposes of this motion.

7. The HHCA defined "public lands" as that term was defined in the Organic Act, which the HHCA amended to provide as follows,

(3) The term 'public lands' includes all lands in the Territory of Hawaii classed as government or crown lands previous to August 15,

thorized to lease HH lands to native Hawaiians under terms specified in section 207 of the HHCA. Section 206 of the HHCA provided that the powers of the governor with respect to "lands of the Territory" did not extend to HH lands except as specifically provided in the HHCA.[8]

Section 212 of the HHCA permitted the HH Commission to return unleased HH lands to the control of the commissioner of public lands. Returned lands resumed the status of "public lands" except that they could be disposed of under a general lease only, and each lease was subject to being terminated by the HH Commission with the approval of the Secretary of the Interior.[9] On September 20, 1921, the HH Commission returned most of the HH lands to the control of the commissioner of public lands, including the Lualualei lands.[10]

In 1925, the Assistant Attorney General of Hawaii advised the HH Commission that the Governor did not have the power to set aside HH lands for a U.S. Aviation Corps station, even if those lands had been returned to the control of the commissioner of public lands. The Assistant Attorney General relied upon sections 206 and 212 of the HHCA, incorporated into the revised laws of Hawaii, for this conclusion.[11] In 1927, the Attorney General of Hawaii advised the HH Commission that HH lands returned to the control of the commissioner of public lands might be set aside thereafter by the Governor for a public use of the Territory by a revocable executive order.[12]

1895, or acquired by the government upon or subsequent to such date by purchase, exchange, escheat, or the exercise of the right of eminent domain, or in any other manner; except (1) lands designated in section 203 of the Hawaiian Homes Commission Act, 1920, (2) lands set apart or reserved by Executive order by the President, ... and (5) lands to which the United States has relinquished the absolute fee and ownership, unless subsequently placed under the control of the commissioner [of public lands] and given the status of public lands in accordance with the provisions of this [Organic] Act, the Hawaiian Homes Commission Act, 1920, or the Revised Laws of Hawaii of 1915;

**8.** Public Law No. 34, 67th Cong., Sess. I, Ch. 42 (1921), *reprinted at* 42 Stat. 108, 110, providing,

SEC. 206. The powers and duties of the governor, the commissioner of public lands, and the board of public lands, in respect to lands of the Territory, shall not extend to lands having the status of Hawaiian home lands, except as specifically provided in this title.

**9.** Section 212 provided,

SEC. 212. The commission may return any Hawaiian home lands not leased as authorized by the provisions of section 207 of this title to the control of the commissioner of public lands. Any Hawaiian home lands so returned shall, until the commission gives notice as hereinafter in this section provided, resume and maintain the status of public lands in accordance with the provisions of the Hawaiian Organic Act and the Revised Laws of Hawaii of 1915, except that such lands may be disposed of under a general lease only. Each such lease, whether or not stipulated therein, shall be deemed subject to the right and duty of the commission of public lands to terminate the lease and return the lands to the commission whenever the commission, with the approval of the Secretary of the

Interior, gives notice to him that the commission is of the opinion that the lands are required by it for leasing as authorized by the provisions of section 207 of this title or for a community pasture.

**10.** Resolution 1 of the Hawaiian Homes Commission, dated September 20, 1921, providing,

BE IT RESOLVED, by the Hawaiian Homes Commission, that all of the available lands which are mentioned and described in Section 203 of the Hawaiian Homes Commission Act, 1920, with the exception of those lands which are specifically mentioned in Paragraph 1 of Section 204 of said Act, be returned to the control of the Commissioner of Public Lands, pursuant to the provisions of and for the purpose prescribed in Sections 212 and 213 of said Act.

**11.** Jan. 1925 to Dec. 1926 Ops. Atty. Gen. of Haw., Op. No. 1290 at 289 (Dec. 18, 1925). The Assistant Attorney General concluded,

The result of these provisions is that while the control of Hawaiian home lands, not in use, may be transferred from the Hawaiian Homes Commission to the Commissioner of Public Lands, yet, even under the control of the latter they are subject to disposal by general lease only, and that lease, itself, must be terminated when the Homes Commission desires to recall the lands for use under the Homes Act.

**12.** Jan. 1927 to Dec. 1928 Ops. Atty. Gen. Haw., Op. No. 1457 at 159 (Nov. 28, 1927). The Attorney General considered the restriction in section 212 of the HHCA that HH lands returned to the commissioner of public lands could only be disposed of by a general lease, and concluded that "disposed of" meant "finally disposed of" and that the Governor's act of setting aside such

### 3. Lands "Set Aside" for the Navy

In December 1928, the Governor and the Navy Department began negotiations concerning land in Lualualei (lot 7A) for an ammunition depot. The Navy requested that the Territory transfer the land to the Navy. The Governor offered to transfer the land under a revocable license, and requested that other Territorial land set aside for the Federal Government during the World War [I] be restored to its previous status under the control of the Territory. The Governor later withdrew his objections to the transfer [13] provided the executive order contained language restoring the land to its previous status under the control of the Territory if the land should cease to be required for purposes of the Navy. The Governor directed the commissioner of public lands to prepare an executive order transferring the land to the Navy and incorporating the conditional language.

On January 21, 1930, by Executive Order No. 382, the Governor set aside lot 7A of the Lualualei lands for a U.S. Naval Reservation for a ammunition depot under the control and management of the Navy.[14] The order contained conditional language returning the land to the control of the Territory if it ceased to be required or used for purposes of the Navy Department. On June 30, 1930, by letter, the Secretary of the Navy accepted control and jurisdiction of the land, but advised that should the land cease to be required or used by the Navy, its return to the Territory would have to depend on the law and circumstances at the time. The Governor acknowledged the letter and asserted that it seemed only reasonable that the land should be restored to the control and management of the Territory if the Navy no longer needed it.

The Governor apparently requested further consideration of the matter. On November 12, 1930, the Secretary of the Navy advised the Governor that according to the U.S. Attorney General [15], the insertion of a conditional return clause in an Executive Order of the President reserving lands of the Territory for use of the War Department would be ineffective and improper. It followed that, if the President could not insert a conditional return clause, then the Secretary of the Navy could not accept one.

On December 22, 1933, the Governor set aside an additional parcel of Lualualei land for a transmitting station for national defense to be under the control and management of the Navy. This executive order also contained conditional language restoring the land to its previous status under the control of the Territory.[16] The Navy

---

land for the Territory merely changed the use of the land. The Governor could revoke his executive order, or the HH Commission could require the return of those lands.

**13.** The Solicitor of the Department of the Interior issued an opinion that the Governor did not have the power to grant a revocable license to the Federal Government, because "title to the lands is in the United States," and the Territory only had possession, use, and control of the land, subject to being taken by proper authority for the uses and purposes of the United States. The possession and control of the Territory was therefore under a license, and if the lands were taken for the use of the United States, the possession, use, and control of the Territory ceased, and the United States became revested therewith. This opinion was transmitted to the Governor on April 14, 1930, after the executive order setting aside lot 7–A had been issued.

**14.** Executive Order No. 382 provides,

EXECUTIVE ORDER NO. <u>382</u>

SETTING ASIDE LAND FOR PUBLIC PURPOSES

I, LAWRENCE M. JUDD, Governor of the Territory of Hawaii, by virtue of the authority vested in me by paragraph q of Section 73 of the Hawaiian Organic Act, and every other authority me hereunto enabling, do hereby order that the following described public land be and the same is hereby set aside for public purposes to wit, for <u>a United States Naval Reservation, for site for Ammunition Depot, to be under the Control and Management of the Navy Department.</u>

\*　\*　\*　\*　\*　\*

<u>PROVIDED, HOWEVER, that should this land cease to be required or used for purposes of the Navy Department, it shall be restored to its previous status under the control of the Territory of Hawaii.</u>
[This is a printed form. Underscoring indicates material added by typewriting.]

**15.** 35 Ops. Atty. Gen. 205 (April 1, 1927).

**16.** Executive Order No. 599 provides,

has remained in possession and control of these lands continuously since the dates of the executive orders, operating a naval magazine and a naval radio transmitting facility, respectively, on the parcels.

### 4. Post–Set–Aside Acts and Representations

The minutes of HH Commission meetings in 1933 reflect the HH Commission's intent to secure the return to the control of the Territory of a portion of Lot 7–A to drill an exploratory well to supply water to the HH Nanakuli homesteads. The July 1934 minutes reflect that the Navy originally gave the HH Commission permission to sink the well, but revoked that permission and granted it to the City and County of Honolulu. The July 1935 minutes reflect that the City and County had undertaken to furnish water to the Nanakuli homesteaders and the residents of Lualualei. In 1938, the Navy granted a revocable permit to the City and County to use part of Lot 7–A for a water well, tanks, and incidental facilities.

> EXECUTIVE ORDER NO. 599
> SETTING ASIDE LAND FOR PUBLIC PURPOSES
> I, LAWRENCE M. JUDD, Governor of the Territory of Hawaii, by virtue of the authority vested in me by paragraph q of Section 73 of the Hawaiian Organic Act, and every other authority me hereunto enabling, do hereby order that the following described public land be and the same is hereby set aside for public purposes to wit, for site for "TRANSMITTING STATION FOR NATIONAL DEFENSE", to be under the control and management of the Navy Department.
> Portion of the Government Land of Lualualei, situate between Land Court Application 1026, (Waianae Company, Applicant), and Lualualei Homesteads, 3rd Series, and the Navy Ammunition Depot, located in the Lualualei Homesteads, 1st Series, Lualualei, Waianae, Oahu, acquired from L.L. McCandless by Condemnation, and Lot 7–A, covered by Governor's Executive Order No. 382.
> \* \* \* \* \* \*
> 6. Should this land cease to be required or used by the Navy Department for the purposes for which it is reserved, it shall be restored to its prvious status, under the control of the Territory of Hawaii.
> [This is a printed form. Underscoring indicates material added by typewriting.]

Thereafter, as mentioned before, the Navy maintained possession and control over the Lualualei lands, operating the ammunition depot and radio transmitting facility.

### B. Statehood and Post–Statehood

#### 1. The Statehood Act

In 1959, Hawaii became a State, pursuant to the Hawaii Statehood Act. Section 5 of the Statehood Act allocated public property between Hawaii and the United States. By subsection 5(a), Hawaii succeeded to the title of the Territory in land in which the Territory held title.[17] By subsection 5(b), the United States granted to Hawaii its title to all "public lands."[18] Subsections 5(a) and 5(b) were subject to the exception of subsection 5(c), which retained title in the United States of "any lands" that were "set aside pursuant to law" for the use of the United States under, *inter alia,* any executive order. These lands remained the property of the United States subject only to limitations imposed by the instrument setting them aside.[19] Subsection 5(b),

17. Public Law 86–3, 86th Cong., 1st Sess. (1959), *reprinted at* 73 Stat. 4, 5, providing,
 SEC. 5. (a) Except as provided in subsection (c) of this section, the State of Hawaii and its political subdivisions, as the case may be, shall succeed to the title of the Territory of Hawaii and its subdivisions in those lands and other properties in which the Territory and its subdivisions now hold title.

18. (b) Except as provided in subsection (c) and (d) of this section, the United States grants to the State of Hawaii, effective upon its admission into the Union, the United States' title to all the public lands and other public property within the boundaries of the State of Hawaii, title to which is held by the United States immediately prior to its admission into the Union. The grant hereby made shall be in lieu of any and all grants provided for new States by provisions of law other than this Act, and such grants shall not extend to the State of Hawaii.

19. (c) Any lands and other properties that, on the date Hawaii is admitted into the Union, are set aside pursuant to law for the use of the United States under any (1) Act of Congress, (2) Executive order, (3) proclamation of the President, or (4) proclamation of the Governor of Hawaii shall remain the property of the United States subject only to the limitations, if any,

which conveyed title to all public lands to Hawaii, was also subject to the exception of subsection 5(d), which permitted public lands controlled by the United States to be set aside during the five years following statehood, and lands so set aside would be the property of the United States.[20]

Subsection 5(e) required all Federal agencies having control over lands retained by the United States pursuant to either 5(c) or 5(d) to report to the President as to its continued need for such lands.[21]

### 2. Post–Statehood Acts and Representations

In January 1960, the Department of Defense submitted a report on its land interests, including a map which shows the Lualualei lands either as fee simple or as set aside under section 91 of the Organic Act.[22] In 1961, the United States Navy issued a Hawaii Property Review Report, which identifies the 132 acre lot as set aside from ceded property by Governor's executive order 382 dated January 21, 1930, and indicates that the property is required to fulfill the Navy's mission.

In 1963, hearings were held on a Senate bill that would amend the Statehood Act to eliminate the five year deadline for conveying surplus property to the State.[23] The people who testified on the bill included both Senators from Hawaii, both Congressmen from Hawaii, and "officials of the State." The Senate Report on the bill made clear that subsections 5(d) and (e) of the Statehood Act did not automatically convey any lands to Hawaii, but that such lands would be conveyed only upon a finding that they were surplus to the United States.[24]

In 1964, Hawaii accepted a quitclaim deed from the United States with respect to nineteen acres of the Lualualei radio station lands. The deed recites that the lands were a portion of the naval reservation covered by the Governor's executive order 599 of 1933, and that they are conveyed under section 5(e) of the Statehood Act.

In 1970, the chairman of the HH Commission publicly called for the Federal Government to return 1500 acres of land in Lualualei to the control of the HH Commission. The chairman stated that the lands were taken by executive order of the President in the 1930's for a naval ammunition depot. In 1971, a concurrent resolution introduced in the Hawaii House of Representatives called for the return of 1700 acres in Lualualei, which belong to the Hawaiian Homes program but which were being leased to the Navy. In 1972, the HH

imposed under (1), (2), (3), or (4), as the case may be.

**20.** (d) Any public lands or other public property that is conveyed to the State of Hawaii by subsection (b) of this section but that, immediately prior to the admission of said State into the Union, is controlled by the United States pursuant to permit, license, or permission, written or verbal, from the Territory of Hawaii or any department thereof may, at any time during the five years following the admission of Hawaii into the Union, be set aside by Act of Congress or by Executive order of the President, made pursuant to law, for the use of the United States, and the lands or property so set aside shall, subject only to valid rights then existing, be the property of the United States.

**21.** (e) Within five years from the date Hawaii is admitted into the Union, each Federal agency having control over any land or property that is retained by the United States pursuant to subsections (c) and (d) of this section shall report to the President the facts regarding its continued need for such land or property, and if the President determines that the land or property is no longer needed by the United States it shall be conveyed to the State of Hawaii.

**22.** Hawaii objects to Defendants' evidence of "section 5(e) [of the Statehood Act] reports" because Defendants have not shown that Hawaii received any of the reports. In any event, the most shown by this map is that the Department of Defense considered the Lualualei lands either "fee simple" lands or "sec. 91 set aside" lands, as opposed to "lease, license, permit, easement" lands.

**23.** S.Rep. No. 675, 88th Cong., 1st Sess. (1963), reprinted at 1963 U.S.Code Cong. & Admin.News 1362.

**24.** The report included a table listing the ammunition depot lands as "ceded" lands and "fee-owned" lands. The radio station lands were listed as "ceded" lands. The table included a category of "permit lands, State" defined as those lands controlled by the Federal Government under permit, license, lease, or easement. None of the Lualualei lands were included in that category.

Commission received a report that recognized that the original 2,000 acres under its control in Lualualei had decreased to 473.5 acres.

Finally, in 1972, the Department of Defense produced a report on its landholdings in Hawaii. The report described "ceded" lands as owned by Hawaii but held for use by the military under Presidential or Gubernatorial Executive Orders issued pursuant to the Hawaii Organic Act, which would revert to the State should the Department of Defense have no further use for them.

### C. *The Controversy*

In 1978, this court held that a 1955 executive order by the Governor of the Territory purporting to set aside HH lands on the island of Kauai for a county beach park was unlawful and void as violative of the HHCA. *Aki v. Beamer*, Civ. No. 76–0144. On June 16, 1983, the Department of Hawaiian Homes Lands wrote to the Secretary of Defense demanding the return of the Lualualei lands. The letter recited the theory that the HHCA deprived the Governor of any power to set aside HH lands and that, therefore, the 1930 and 1933 executive orders setting aside the Lualualei lands were void. The letter further advised that the Navy's use of the Lualualei lands "at least since 1933" has been wrongful.

On March 5, 1984, the Navy responded. The Navy took the position that the Lualualei lands were properly set aside for Navy use, and "are presently owned by the United States in fee simple." On March 2, 1987, the Secretary of the Navy made his

declaration that the lands set aside by executive orders 382 and 599, in 1930 and 1933 respectively, presently comprising portions of the Lualualei Naval Radio Transmitting Facility and the Lualualei Naval Ammunition Depot, are being used and are required by the United States for national defense purposes.

### QUIET TITLE ACTIONS AGAINST THE UNITED STATES

 The Lualualei lands are being used and are required by the United States for national defense purposes. The Secretary of the Navy's determination to that effect is not subject to judicial review. 28 U.S.C. § 2409a(h). Therefore, Hawaii cannot maintain this action so long as the Lualualei lands are so used or required if it knew or should have known of the United States' claims more than twelve years before filing the complaint.[25] Notice of the cause of action accruing must be by public communications sufficiently specific to put Hawaii on notice of the Federal claim, or by open and notorious use, occupancy, or improvement of the land.[26]

 The States of the Union, like all other entities, are barred by federal sovereign immunity from suing the United States absent an express waiver of this immunity by Congress. Only upon passage of the QTA did the United States waive its immunity with respect to suits involving title to land. *Block v. North Dakota*, 461 U.S. 273, 280, 103 S.Ct. 1811, 1816, 75 L.Ed.2d 840 (1983). The QTA's statute of limitations on the United States' waiver of sovereign immunity is strictly construed. *State of Cal. v. Yuba Goldfields, Inc.*, 752 F.2d 393, 396 (9th Cir.

---

**25.** 28 U.S.C. § 2409a(h) No civil action may be maintained under this section by a State with respect to defense facilities (including land) of the United States so long as the lands at issue are being used or required by the United States for national defense purposes as determined by the head of the Federal agency with jurisdiction over the lands involved, if it is determined that the State action was brought more than twelve years after the State knew or should have known of the claims of the United States. Upon cessation of such use or requirement, the State may dispute title to such lands pursuant to the provisions of this section. The decision of the

head of the Federal agency is not subject to judicial review.

**26.** 28 U.S.C. § 2409a(k) Notice for the purposes of the accrual of an action brought by a State under this section shall be—

(1) by public communications with respect to the claimed lands which are sufficiently specific as to be reasonably calculated to put the claimant on notice of the Federal claim to the lands, or

(2) by the use, occupancy, or improvement of the claimed lands which, in the circumstances, is open and notorious.

1985), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 526, 88 L.Ed.2d 458 (1985); *State of Nevada v. United States,* 731 F.2d 633, 634 (9th Cir.1984).[27]

■ Timely commencement of an action to quiet title against the United States is a prerequisite of subject matter jurisdiction. *McIntyre v. United States,* 789 F.2d 1408, 1411 (9th Cir.1986). The statute of limitations begins to run when the plaintiff or its predecessor in interest knew or should have known of the claim of the United States, which imparts a test of "reasonableness." *Id.*

■ Notice of a clear and unambiguous claim is not required to start the QTA's statute of limitations running. *State of Cal. v. Yuba Goldfields, Inc.,* 752 F.2d 393, 397 (9th Cir.1985), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 526, 88 L.Ed.2d 458 (1985). Knowledge of the claim's full contours is not required. All that is necessary is a reasonable awareness that the United States claims "some" interest adverse to the plaintiff. *North Dakota ex rel. Bd. of University v. Block,* 789 F.2d 1308, 1313 (8th Cir.1986); *Knapp v. United States,* 636 F.2d 279, 283 (10th Cir.1980). Whether the interest claimed amounts to legal title in the United States is irrelevant if it constitutes a cloud on the plaintiff's title. *Knapp,* 636 F.2d at 282.

■ The QTA's statute of limitations is triggered by the plaintiff's knowledge of the transaction that constituted the alleged violation, not by its knowledge of the law. A claim accrues as soon as a potential claimant either is aware or should be aware of the existence of and source of his injury, not when he knows or should know that the injury constitutes a legal wrong. *Lee v. United States,* 809 F.2d 1406, 1410 (9th Cir.1987). The existence of one uncontroverted instance of notice suffices to trigger the statute of limitations period. *State of Nevada v. United States,* 731 F.2d 633, 635 (9th Cir.1984); *see Park County Montana v. United States,* 626 F.2d 718, 720 & n. 6

(9th Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 923, 66 L.Ed.2d 841 (1981).

In *United States v. Mottaz,* 476 U.S. 834, 106 S.Ct. 2224, 90 L.Ed.2d 841 (1986), the plaintiff's Indian predecessors received allotments of land from the United States in 1905, and plaintiff claimed to have inherited fractional interests in the land. In 1954, the United States sent letters to all heirs of the original allottees seeking objections to a proposed sale of the land. Receiving no response, the United States sold the land to the U.S. Forest Service. In 1967, the Bureau of Indian Affairs gave plaintiff a list of all her land interests, which did not include the disputed lands. In 1981, plaintiff sued the United States, seeking money damages or rescission of the sale and vesting title in her, claiming, *inter alia,* that the United States breached its fiduciary duties.

The Eighth Circuit held that plaintiff's suit could not be time barred because the sale of an allotment to a government agent in violation of federal law is void, therefore the concept of a cause of action accruing is inapplicable because the allottee simply retains title all along. The Supreme Court reversed, holding that the suit was barred under the QTA because the plaintiff knew of the 1954 sale, and was on notice by 1967 that the United States did not recognize her title. Therefore, plaintiff knew or should have known of the United States' claim more than twelve years before she brought suit. The Supreme Court concluded,

Federal law rightly provides Indians with a range of special protections. But even for Indian plaintiffs, "[a] waiver of sovereign immunity 'cannot be lightly implied but must be unequivocally expressed.'" *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969). Congress has consented to a suit challenging the Federal Government's title to real property only if the action is brought within the 12–

---

**27.** No cases involving states have been published since the amendment of the QTA in 1986. Authorities cited herein construe the same standard—whether the state knew or should have known of the federal claims—as that applicable to states now.

year period set by the Quiet Title Act. The limitations provision of the Quiet Title Act reflects a clear congressional judgment that the national public interest requires barring stale challenges to the United States' claim to real property, whatever the merits of those challenges.

In *Government of Guam v. United States*, 744 F.2d 699 (9th Cir.1984), the Territory of Guam sued the United States to quiet title to lands in Guam. The Ninth Circuit affirmed a grant of summary judgment to the United States, holding the action barred by the statute of limitations.

The 1950 Organic Act of Guam established a civil government for Guam, which had been governed by a Naval Government. Section 28(a) of the Organic Act directed the United States to transfer to the new Government of Guam all property owned by the United States and used by the Naval Government for civil administration. Section 28(b) provided that all other property owned by the United States was to be administered by the new Government of Guam, unless reserved by the President. Property reserved by the President was to be retained and administered by the United States. The Organic Act established an elected legislature and a Governor appointed by the President.

In 1950, the Naval Government transferred certain lands to the United States, and later transferred a number of lands to the Government of Guam, but reserved others including those in dispute. The President then issued an executive order reserving all of the lands in dispute to the United States. On January 4, 1971, the Governor of Guam became an elected office.

On January 12, 1983, Guam instituted the quiet title action, claiming that certain lands which should have been transferred to it under section 28(a) were unlawfully retained by the United States, allegedly pursuant to a reservation by the President under section 28(b). Guam argued that it should not be subject to the statute of limitations because the United States maintained plenary power over the territory. Without reaching the merits of that argument, the court held that the statute had run in any event because Guam became sufficiently independent on January 4, 1971, when the Governor ceased being appointed by the President. Suit was filed eight days outside the statute of limitations.

The Ninth Circuit held the Government of Guam chargeable with knowledge of the United States' claims, by virtue of the deed to the United States, the executive order, and the failure of the United States to convey the lands to Guam. The court rejected Guam's contention that,

> ... these actions were insufficient to provide notice of the United States' claims because they were substantively ineffective. This confuses the merits of Guam's claim with the notice necessary to invoke the statute of limitations. "[T]he crucial issue in [the] statute of limitations inquiry is whether [the plaintiff] had notice of the federal claim, not whether the claim itself is valid." *Nevada v. United States,* 731 F.2d at 635. The merit of a claim is irrelevant to operation of the bar of a statute of limitations.

In *State of Cal. v. Yuba Goldfields, Inc.*, 752 F.2d 393 (9th Cir.1985), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 526, 88 L.Ed.2d 458 (1985), California sued the United States and others to quiet title to a portion of the Yuba River. The Ninth Circuit affirmed a grant of summary judgment to the United States on statute of limitations grounds. In 1906, in connection with federal flood control, California and the United States each contributed one-half of the acquisition costs to purchase the disputed land. Deeds reflecting the United States as sole grantee were recorded. In 1912, a portion of the land was sold and the United States retained the proceeds. In 1970, the Army Corps of Engineers inquired of the California State Lands Commission whether California intended to claim title to the properties. The Commission claimed the property as sovereign land of California. In 1978, the Corps advised the California Attorney General that the United States was the sole fee owner of the property.

The district court found that California had actual knowledge of the acquisition of the property and the taking of title in the name of the United States, and that California knew or should have known of the claim of the United States in the early 1900's. On appeal, California contended,

[T]hat under the Quiet Title Act a cause of action accrues when a state becomes reasonably aware of the United States' claim; that the claim must be truly adverse to the state's claim; and that the United States must communicate its claim to the state in a clear and unambiguous manner.

The Ninth Circuit held that California had actual knowledge of the United States' claim because it was aware that the deeds were recorded in the name of the United States. Additionally, California was aware that the United States' claim was independent of any claim California may have had because it was aware that the United States had sold part of the land and retained the proceeds. Finally, the court stated,

The Court is not persuaded by California's contention that the deeds cannot constitute notice of the federal claim because the property was acquired through the joint efforts of the United States and California. The mere fact that the project was undertaken with California's cooperation does not lead to the conclusion that California was unaware of the federal interest in the property.

In *Knapp v. United States,* 636 F.2d 279 (10th Cir.1980), in 1939 a landowner conveyed a two acre easement across his land to the United States for a livestock driveway. The easement contemplated a pending land purchase and was to last only until negotiations had been completed. Three months later, the landowner executed a warranty deed conveying to the Wyoming Grazing District a forty-eight acre parcel of land that included the two acre strip. In 1940, the Wyoming Grazing District (a geographical unit established by the Secretary of the Interior to promote the highest use of public land) conveyed by deed the forty-eight acre parcel to the Secretary of the Interior. Both deeds were recorded. The landowner and his successors, the plaintiffs, continued to treat the parcel, except the two acre easement, as their own property.

In 1958, a third party told the plaintiffs about the deeds in the county records, and they wrote to the Bureau of Land Management that the descriptions in the deeds were mistakes, that the landowner's intent was to merely convey the two acre strip. The district land manager of the BLM agreed with the plaintiffs' view and referred the matter to the BLM legal staff. In 1958, the land manager advised the plaintiffs that a two step process would be required to reconvey the land—a survey of the land and a special act of Congress. The government finally approved a survey in 1971, but efforts with Congress proved unsuccessful, and plaintiffs filed suit in 1977.

The district court reasoned that the deeds to and from the Wyoming Grazing District were void because the District is a geographical unit and not a legal entity. Therefore, the government never acquired title and never had a claim to which the statute of limitations could apply. Alternatively, the district court ruled that the government's claim did not arise until 1971 because that was the first time the government had definitively asserted an interest greater than a right-of-way. The Tenth Circuit reversed, holding that the QTA covers disputes in which the United States claims "an interest," whether the interest claimed amounts to legal title in the United States is irrelevant if it constitutes a cloud on the plaintiff's title. Knowledge of the claim's full contours is not required. All that is necessary is a reasonable awareness that the United States claims some interest adverse to the plaintiff's. Additionally, the court held that the trial court's conclusion that the deeds were legal nullities did not render the statute of limitations inapplicable.

## ANALYSIS OF HAWAII'S CLAIMS

### A. *Hawaii's Pleadings*

Hawaii has asserted a number of different theories to support its action. In the

complaint, Hawaii alleged that the Lualualei lands were unlawfully transferred to Defendants because the 1930 and 1933 executive orders violated the HHCA, and therefore were void *ab initio* and without legal effect. Thus, Defendants' use and possession of the lands on the basis of the executive orders have been and continue to be illegal and unauthorized. Hawaii alleged that the Lualualei lands were conveyed to it by sections 4 and 5(f) of the Statehood Act,[28] and that Defendants breached their trust obligations by claiming fee simple title to the Lualualei lands.

In its opposition to Defendants' motion for summary judgment, Hawaii focused on Defendants' claim to "fee simple ownership of the land," and contended that the first claim "adverse" to that of Hawaii was the claim to fee simple ownership in 1984. Along this line, Hawaii argued that neither the executive orders nor the Statehood Act purported to convey title to the Defendants, and that the acts of the parties did not amount to recognition or notice of title in the Defendants. Hawaii also asserted that it believed the executive orders were legal until 1978, and that "[u]ntil 1984, [Defendants] never indicated that [they were] claiming Lualualei without regard to the terms or legality of the Executive Orders."

Finally, in its supplemental opposition, Hawaii contended that until 1984 it had no notice that the Defendants claimed an interest greater than that granted them by the executive orders, and that until 1983 Defendants' use and possession of the lands were permissive or consensual. Hawaii asserted that the claim of the Defendants that triggered the statute was their assertion of fee ownership of Lualualei regardless of the legality of the transfer and Hawaii's right to reclaim the lands.

### B. *The Theories and Their Merits*

From Hawaii's pleadings, and its arguments at the hearing of the motion, five separate theories emerge.

1. *The First Theory* is that, prior to the 1930 and 1933 executive orders title was in the Territory, the orders were void *ab initio*, and Defendants took nothing thereby. Title then passed to Hawaii upon statehood pursuant to subsection 5(a). The premise that title was in the Territory is incorrect.[29] In any event, Hawaii abandoned this theory at oral argument, conceding that legal title was in the United States prior to statehood.

2. *The Second Theory* acknowledges that, prior to statehood, legal title was in the United States. Subsection 5(b) conveyed that title to Hawaii. Subsection 5(c) did not apply because the executive orders were illegal and not "pursuant to law." Thus, before statehood Defendants had legal title alone, and since statehood have had no legal interest in the lands. This theory fails because one uncontroverted instance of notice that Defendants had *any* interest in the Lualualei lands is suffi-

---

**28.** These sections do not purport to affect title to any lands. Section 4 required Hawaii to adopt certain provisions of the HHCA "as a provision of the Constitution of said State." Section 5(f) only provides that lands conveyed to Hawaii by other subsections "shall be held by said State as a public trust." The only provisions of the Statehood Act purporting to convey title to Hawaii are subsections 5(a) and 5(b). Subsection 5(e) permits the United States to convey other lands to Hawaii, but is not self-executing.

**29.** The United States received title to all public lands at annexation. The Organic Act only placed public lands in the "possession, use, and control" of the Territory, it did not convey title, which remained in the United States. *See United States v. Chun Chin*, 150 F.2d 1016, 1017 (9th Cir.1945); *see also United States v. Marks*, 187 F.2d 724, 730 (9th Cir.1951), *cert. denied*, 342 U.S. 823, 72 S.Ct. 42, 96 L.Ed. 622 (1951); *see*

also State by Kobayashi v. Zimring, *58 Haw. 106, 124, 566 P.2d 725, 735 (1977). The HHCA placed designated lands under the control of the HH Commission, but left title to those lands in the United States. HHCA § 207(b) ["The title to lands so leased shall remain in the United States."];* see Keaukaha–Panaewa Com. v. Hawaiian Homes Comm'n, *739 F.2d 1467, 1469 (9th Cir.1985);* see also Keaukaha–Panaewa Com. v. Hawaiian Homes Comm'n, *588 F.2d 1216, 1218 (9th Cir.1978),* cert. denied, *444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979). The United States conveyed title to HH lands, together with title to other public lands, to Hawaii upon statehood.* See Price v. State of Hawaii, *764 F.2d 623, 625 (9th Cir.1985),* cert. denied, *474 U.S. 1055, 106 S.Ct. 793, 88 L.Ed.2d 771 (1986);* see also Trustees of Hawaiian Affairs v. Yamasaki, *737 P.2d 446, 449–50 (Haw.1987).*

cient to trigger the statute of limitations. The continuous use, possession, and control of the Lualualei lands by the Navy since the 1930's is sufficient to put Hawaii on notice that Defendants claimed some interest in the lands. 28 U.S.C. § 2409a(k)(2). Additionally, the HH Commission minutes regarding the water well, the 1963 hearings and report, the 1964 quitclaim deed, the calls for return of the land by the HH Commission in 1970 and by the Hawaii House of Representatives evidence Hawaii's actual knowledge that Defendants claimed at least some interest in these lands.

▮▮▮▮ Hawaii's contention that it did not have notice that Defendants claimed an adverse interest until the 1978 ruling in *Aki v. Beamer* holding other executive orders void is meritless.[30] First, the contention is factually incorrect. The Territory and the HH Commission had actual knowledge of the purported legal basis for holding the executive orders illegal since 1925, as demonstrated by the published opinion of the Territory's Assistant Attorney General. Second, the rule is that a claim accrues as soon as a potential claimant either is aware or should be aware of the existence of and source of his injury, not when he knows or should know that the injury constitutes a legal wrong. *Lee*, 809 F.2d at 1410. A contrary rule—that a party may wait in ignorance to bring a cause of action until a favorable legal precedent comes to his attention—would vitiate any statute of limitations.

▮▮▮ 3. *The Third Theory* is that, prior to statehood, legal title was in the United States and equitable title was in the Terri-

tory. The Statehood Act effected a merger of titles in Hawaii. The Territory, and then Hawaii, consented to Defendants' possession of the Lualualei lands without regard to the legality of the executive orders. Hawaii revoked its consent in 1983, and Defendants first manifested an adverse claim by refusing to return the lands in 1984.

This is an interesting, if ultimately meritless, argument to circumvent the QTA's statute of limitations, and contest the legality of the executive orders in excess of fifty years after they were executed, and twenty-eight years after statehood. However, Hawaii is not an aggrieved landlord attempting to dispossess a tenant claiming to have acquired the property by adverse possession. Defendants only need to show that Hawaii knew or should have known that Defendants had some claim to the lands greater than their possession by virtue of Hawaii's naked consent, purportedly extended notwithstanding the illegality of the executive orders. Hawaii's argument fails because it relies on the fiction[31] that all parties acknowledged from the outset that (1) the orders were illegal and (2) Defendants' continued possession was at the sufferance of the Territory and the State of Hawaii. All the evidence shows that Defendants have continuously relied upon the legality of the executive orders as the basis of their possession of the Lualualei lands, and as the basis of their retention of those lands upon statehood.

Moreover, this theory fails to account for notice provided by the Statehood Act. Subsections 5(a) and 5(b) conveyed title to certain lands to Hawaii. However, both subsections are also expressly limited by sub-

**30.** Hawaii implies that this court should not "validate" the illegality and resultant voidness of the executive orders. The Supreme Court and the Tenth Circuit have rejected arguments that the QTA's statute of limitations is somehow inapplicable when the United States' claim is based upon an allegedly "void" transaction. *Mottaz,* 106 S.Ct. at 2228, 2234; *Knapp,* 636 F.2d at 282–83. This court also rejects the argument, which confuses the merits of a claim with notice of a claim.

**31.** Hawaii asserts that Defendants' initial entry onto the Lualualei lands was consensual, which is true to the extent that Defendants entered

pursuant to the executive orders, which manifested the Governor's consent. Hawaii then engages in the fiction that Defendants' entry was pursuant *only* to its consent. Even if this fiction was fact, Hawaii's cause would still be barred. In *Yuba Goldfields,* 752 F.2d at 396, California argued that it had consented to the arrangement there and that the United States did not deny its interest in the land until 1978. In *Knapp,* 636 F.2d at 281, the United States agreed with the plaintiffs' claim and attempted to correct the situation. The claims were barred in both cases.

section 5(c), which provides that any lands set aside pursuant to law for the use of the United States under any executive order shall remain the property of the United States. The Lualualei lands were "set aside" by the 1930 and 1933 executive orders, which recite that they are made pursuant to legal authority. Regardless of Hawaii's present opinion of the validity of the executive orders, the orders raised a question as to whether subsection 5(c) applied to the Lualualei lands sufficient to put Hawaii on notice in 1959 that a cloud may exist on its title to those lands. Additionally, since Defendants controlled the Lualualei lands at the time of statehood, then subsection 5(d) provided another ground for Defendants' retention of the lands, and also put Hawaii on notice of Defendants' claims.[32]

Here, as in *Guam, supra,* 744 F.2d at 701, the former Territory had actual knowledge of the statutory plan for allocating title to lands. Guam should have known of the federal claims to the lands it claimed because the treatment of those lands following enactment of the Organic Act of Guam was inconsistent with Guam's claims.

Here, the treatment of the Lualualei lands following statehood was inconsistent with Hawaii's present claim. Subsections 5(c) and 5(d), coupled with the existence of the executive orders and Defendants' control of the lands, put Hawaii on notice that Defendants had a claim to the lands that permitted their retention irrespective of Hawaii's "consent." Moreover, the 1964 quitclaim deed gave actual notice that Defendants retained the lands under the Statehood Act, and conveyed them to Ha-

waii under subsection 5(e) only upon finding them to be surplus.

■ 4. *The Fourth Theory* is that prior to statehood title was in the United States, and the United States retained the lands under subsection 5(c) of the Statehood Act. However, the conditional return language in the executive orders remains effective. Therefore, if Defendants cease to use the lands for the purposes stated in the executive orders, control of the lands returns to Hawaii. Thus, Hawaii argues that it had no notice that Defendants had an *adverse* claim until they claimed "fee simple" title in 1984. However, Hawaii's claim to a reversionary interest in the Lualualei lands based on the conditional language in the executive orders is barred because it has been on notice that the United States had an adverse claim since 1930.

The letters to the Governor of the Territory, the opinion of the Solicitor of the Interior Department that was sent to the Governor, and the published opinion of the U.S. Attorney General indicate Defendants' position that the conditional return language in the executive orders was of no legal effect.[33] Hawaii contends that the letters actually accept the Governor's position and agree to bind the then-current administration to it.[34] It misperceives the nature of this inquiry. The issue is whether it should have known that Defendants had some claim adverse to Hawaii's present claim. The letters gave the Governor actual knowledge of the U.S. Attorney General's opinion that conditional return clauses were improper and ineffective. Although the matter was left unresolved, the Gover-

---

**32.** Subsections 5(d) and 5(e) permit the President to "set aside" for the United States any land conveyed to the State by subsection 5(b) but controlled by the United States, or if the President determined that the land was no longer needed, to convey it to the State. However, conveyances to the State under subsections 5(d) and 5(e) were not self-executing, as recognized at the 1963 Congressional hearing at which State officials testified, and as recorded in the Senate report. Because the Lualualei lands were controlled by Defendants and because there is no separate conveyance of them to Hawaii after passage of the Statehood Act, it

would appear that Defendants kept them pursuant to subsection 5(d).

**33.** Although the letters refer to the Lot 7–A parcel and not the parcel set aside in 1933, the premise underlying the United States' claims with respect to both parcels is the same, and the notice extends to the latter parcel as well. *See North Dakota ex rel. Bd. of University v. Block,* 789 F.2d 1308, 1312 (8th Cir.1986).

**34.** The court takes judicial notice that Herbert Hoover is no longer President of the United States of America.

nor had actual notice of the Defendants' claim that the conditional return language was ineffective. Hawaii is chargeable with that notice and should have brought suit when it obtained sufficient independence, at statehood. *See Guam*, 744 F.2d at 701.

 5. *The Fifth Theory* is that the United States had title, and retained the lands upon statehood, but that the lands are subject to the "return on demand" provision in section 212 of the HHCA. The HH Commission first demanded return in 1983, and Defendants refused, thereby manifesting an "adverse" claim for the first time.

However, the evidence shows that Hawaii knew or strongly suspected that Defendants claimed the Lualualei lands free from any right of Hawaii's to demand return. In the 1930's, the HH Commission knew that it could not simply demand the return of a portion of the lands, even when it wanted to drill a well to benefit HH homesteaders. In the early 1970's, the calls for the return of the lands demonstrated the beliefs of Hawaii officials and representatives that Defendants' claim to the lands was not subject to section 212 of the HHCA. Their behavior shows not only that Hawaii was aware that Defendants claimed an interest adverse to Hawaii's ability to obtain the lands simply by demanding them, but also that Hawaii believed Defendants' claim to be correct.

CONCLUSION

 Assuming that the statute of limitations would not run against the Territory with an appointed Governor, if Hawaii knew or should have known of Defendants' claim to the Lualualei lands upon Statehood, or at any time thereafter until October 23, 1974, then this action cannot be maintained until the Navy no longer uses or requires the lands for national defense purposes. Hawaii is deemed to have notice of all that its predecessor-in-interest, the Territory, had notice.

Hawaii's claim is that Defendants has no interest in the Lualualei lands because the 1930 and 1933 executive orders were "void *ab initio*" is barred because the Navy's open and notorious use and possession of the lands gave notice, and public communications from the 1930's until the present recognize that Defendants claimed "some" interest, in fact a substantial interest, in the lands.

Hawaii's alternative theories are simply attempts to evade the statute of limitations and attack the executive orders at far too late a date. The theories are creative, but contrary to the facts and to the clearly manifested understandings of the parties. They have no merit.

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is GRANTED.